# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

COURCHEVEL 1850 LLC,                                    Civil Action No.:
                                                       1:17-cv-00785(JBW)(SMG)

                        Plaintiff,

                                                       AFFIDAVIT OF JARED
                                                       DOTOLI

            -against-

MOHAMMED ALAM; KOZNITZ I LLC; UNITED
STATES OF AMERICA (INTERNAL REVENUE
SERVICE);   NY   STATE   DEPARTMENT   OF
TAXATION  AND  FINANCE;  CITIBANK, N.A.;
CITIBANK (SOUTH DAKOTA), N.A.; NEW YORK
CITY  ENVIRONMENTAL  CONTROL  BOARD;
NEW  YORK  CITY  TRANSIT  ADJUDICATION
BUREAU;   NEW   YORK   CITY   PARKING
VIOLATIONS BUREAU;

                        Defendants.
-------------------------------------------------------------X


STATE OF FLORIDA              )
                             )        ss.:
COUNTY OF MIAMI DADE          )

        JARED DOTOLI, being duly sworn, deposes and says that:

        1.      I am the Sole Member of Courchevel 1850 LLC ("Courchevel" or "Plaintiff"),

Plaintiff in the above-referenced foreclosure case and as such, I have personal knowledge of the

facts of this case and the events that transpired to date by virtue of my review of the records

maintained by Plaintiff in the ordinary course of business and all of the pleadings and proceedings

herein.

        2.      I make this affidavit in response to the Defendant Koznitz I LLC's Motion to

Dismiss pursuant to Fed. R. Civ. P. Rule 12(b)(1) and its Motion for Sanctions pursuant to Fed. R.

Civ. P. Rule 11.

3.      On January 11, 2017, on behalf of Courchevel as its Sole Member, I purchased a Note and Mortgage which were both dated August 18, 2008 and made by Defendant Mohammed Alam from Blue Lagoon LLC (hereinafter "Note" and "Mortgage").  *See* Note and Mortgage attached at **Exhibit "A".**

4.      Specifically, the transfer was based on a Purchase Agreement executed on January 10, 2017 between Blue Lagoon LLC and Courchevel 1850 LLC. *See* Purchase Agreement attached hereto at **Exhibit "B".**

5.      As evidenced by the Purchase Agreement, Courchevel 1850 LLC paid good and valuable consideration to Blue Lagoon LLC when the Note and Mortgage were duly transferred to Courchevel.

6.      Defendant's Counselor alleges that Plaintiff has failed to comply with this Court's *sua sponte* Order to Show Cause by not providing an exact amount of what was exchanged to purchase the Note.  The Purchase price has been purposely redacted from the Purchase Agreement. The Defendant's allegations are not correct, this Court specifically requested whether any meaningful consideration was paid and any evidence of it.  Same is annexed.

7.      The Defendant and its Counselor are not entitled to what dollar amount was exchanged to transfer the Note to Plaintiff.  Similarly, Plaintiff is not requesting what amount of money was exchanged by Koznitz I LLC for the transfer of the Property which is the subject of this foreclosure action.  Defendant does not provide any authority that Plaintiff "must" disclose this proprietary information.

8.      Courchevel 1850 LLC exchanged money for the Note as part of its purchase.

9.    Courchevel 1850 LLC obtains financing from various investors who pool their money together to purchase notes which are secured by mortgages, which are sometimes purchased in bulk. The notes are purchased from a variety of sellers in the second market.

10.    Courchevel 1850 LLC is in the business of purchasing distressed loans and servicing those loans with an eye toward modifying and making them performing loans.

11.    Courchevel offers a variety of retention and/or non-retention options to borrowers. Courchevel has been successful on several occasions in modifying the terms of the note and mortgage and allowing the borrowers to keep their property.

12.    Courchevel is more flexible and willing than big banks and/or servicers to offer a variety of programs to assist homeowners. COURCHEVEL 1850 LLC does not purchase loans with the intent of only foreclosing on the loans.

13.    With regards to Yonel Devico, he sometimes serves in an advisory capacity to Courchevel. Yonel Devico is my mentor and my friend. This is not a crime.

14.    Yonel Devico does not have control over Courchevel nor are the profits remitted to Yonel Devico for his services or his advice.

15.    The Defendant has engaged in a crusade to forestall the instant lawful foreclosure action. Defendant is a non-borrower entity who purchased the Property subject to the Plaintiff's Mortgage. Defendant has no standing to make these arguments. Based on the foregoing, the Defendant's Motions must be denied in their entirety.

THIS SPACE IS LEFT INTENTIONALLY BLANK.

I respectfully submit this Affidavit knowing full well that the United States District Court, Eastern District of New York is relying upon the truth of the statements contained herein. I hereby make oath or affirmation that the contents of this affidavit are true and correct to the best of my knowledge, information and belief.

Jared Dotoli, Member of
Courchevel 1850 LLC

STATE OF FLORIDA          )
                                           ss:
COUNTY OF Miami-dade

On this 3 day of July , 2019 before me, the undersigned notary public, personally appeared Jared Dotoli [Name of Document Signer], personally known to the notary or proved to the notary through satisfactory evidence of identification, which was US/PP [Type of Identification], to be the person who signed the preceding or attached document in my presence, and who swore or affirmed to the notary that the contents of the document are truthful and accurate to the best of his or her knowledge and belief.

(Seal) _____

Official signature of notary _____ Printed or typed name of notary

Ashley Amaya

Ashley Amaya
NOTARY PUBLIC
STATE OF FLORIDA
Comm# GG051976
Expires 12/1/2020

# EXHIBIT A

# BALLOON NOTE
## (Fixed Rate)
## (Secondary Lien)

THE TERM OF THE LOAN IS 15 YEARS. AS A RESULT, YOU WILL BE REQUIRED TO REPAY THE ENTIRE PRINCIPAL BALANCE AND ANY ACCRUED INTEREST THEN OWING 180 MONTHS FROM THE DATE ON WHICH THE LOAN IS MADE.

THE LENDER HAS NO OBLIGATION TO REFINANCE THIS LOAN AT THE END OF ITS TERM. THEREFORE, YOU MAY BE REQUIRED TO REPAY THE LOAN OUT OF ASSETS YOU OWN OR YOU MAY HAVE TO FIND ANOTHER LENDER WILLING TO REFINANCE THE LOAN. ASSUMING THIS LENDER OR ANOTHER LENDER REFINANCES THIS LOAN AT MATURITY, YOU WILL PROBABLY BE CHARGED INTEREST AT MARKET RATES PREVAILING AT THAT TIME AND SUCH RATES MAY BE HIGHER THAN THE INTEREST RATE ON THIS LOAN. YOU MAY ALSO HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW MORTGAGE LOAN.

DEFAULT IN THE PAYMENT OF THIS LOAN AGREEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF YOU HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE YOU WITH A SEPARATE WRITTEN NOTICE SPECIFYING THE CIRCUMSTANCES AND TIMES UNDER WHICH YOU CAN EXERCISE THIS RIGHT.

| August 18, 2008 | Brooklyn | New York |
|---|---|---|
| *[Date]* | *[City]* | *[State]* |

3228 97th Street, East Elmhurst, NY 11369
*[Property Address]*

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 177,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. The Lender is **AmTrust Bank.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **10.500%.**

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

(A) **Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the 1st day of each month beginning on **October 1, 2008.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before

New York Balloon Fixed Rate Note--Single Family--Secondary Lien

—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 1 of 3

Modified Form 3260.33 (Rev. 05/02)
Modified by "The Compliance Source, Inc." 84200SNY 06/03 Rev. 03/04
©2003, The Compliance Source, Inc.

Principal. If, on **September 1, 2023,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O Box 790376, St. Louis, MO   63179-0376** or at a different place if required by the Note Holder.

    **(B)**    **Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. **$ 1,619.09.**

**4.**    **BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5.**    **LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.**    **BORROWER'S FAILURE TO PAY AS REQUIRED**

    **(A)**    **Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **2.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

    **(B)**    **Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    **(C)**    **Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    **(D)**    **No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    **(E)**    **Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.**    **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

New York Balloon Fixed Rate Note—Single Family—Secondary Lien
—THE COMPLIANCE SOURCE, INC.—        Page 2 of 3
www.compliancesource.com

Modified Form 3260.33 (Rev. 05/02)
Modified by "The Compliance Source, Inc." 84200TNY 06/03 Rev. 03/04
© 2004 The Compliance Source

**8.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person, who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.    SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

**AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED.**

Lender may require Immediate Payment In Full of all Sums Secured by this Security Instrument if all or any part of the property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment In Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires immediate payment in full under this Section, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given in the manner required by Section 14 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Pay to the order of the Federal Deposit Insurance Corporation as Receiver for AmTrust Bank of Cleveland, Ohio._
_By: Federal Home Loan Bank of Cincinnati without recourse or warranty_

_____ (Seal)
Mohammed Alam                -Borrower

_____ (Seal)
By: Matthew T. Viola, Attorney in Fact (or Authorized Signature)   -Borrower

_____ (Seal)
                                     -Borrower

PAY TO THE ORDER OF THE FEDERAL HOME LOAN BANK OF CINCINNATI WITHOUT RECOURSE OR WARRANTY.
[Sign Original Only]

_____ (Seal)
                                     -Borrower

NAME OF MEMBER: AmTrust Bank
BY: _____
BY: _____

Cleveland, Ohio
PAY TO THE ORDER OF

Without Recourse
AmTrust Bank
f/k/a Ohio Savings Bank

By: _____
Amy Hull

New York Balloon Fixed Rate Note—Single Family—Schuyler Lien

—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 9 of 3

Modified Form 3260.33 (Rev. 05/02)

Modified by "The Compliance Source, Inc." 84200TNY 06/03 Rev. 03/04
©2004, The Compliance Source, Inc.

Pay To The Order Of

BAYVIEW LOAN SERVICING, LLC

WITHOUT RECOURSE

FEDERAL DEPOSIT INSURANCE CORPORATION

As Receiver for AmTrust Bank

By: _____

Jason Jones, Attorney in Fact

BV#

ALLONGE TO NOTE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE NOTE REFERRED TO BELOW:

BORROWER: MOHAMMED ALAM,

ORIGINAL PRINCIPAL BALANCE: $177,000.00

PROPERTY ADDRESS: 3228 97TH STREET, EAST ELMHURST, NY 11369

PAY TO THE ORDER OF:
        **RCS** RECOVERY SERVICES, LLC

WITHOUT RECOURSE
BAYVIEW LOAN SERVICING, LLC

BY: _____

NAME: PEDRO L. SUAREZ
TITLE:  Assistant Vice-President

# Allonge to the Note

Loan #:

Borrower: ALAM,MOHAMMED

Co Borrower:

Date of Note: 08/18/2008

Loan Amount: $177,000.00

Property Address: 3228 97TH STREET, EAST ELMHURST, NY 11369

For value received, I hereby transfer, endorse and assign the within Note and Deed of Trust / Mortgage securing the same, so far as the same pertains to said note.

Pay to the order of: _BLUE LAGOON LLC_____, without recourse

**RCS Recovery Services, LLC**

Seth A. Miller, Manager

## ALLONGE TO PROMISSORY NOTE

This Allonge is to be attached and made a part of that certain Promissory Note dated August 18, 2008 in the original principal amount of One Hundred and Seventy-Seven Thousand and 00/100 Dollars ($177,000.00) executed by Mohammed Alam to the order of AmTrust Bank.


Pay to the order of COURCHEVEL 1850 LLC

WITHOUT RECOURSE, on _1/11/2017_ (date)


By: Blue Lagoon LLC


By: _____

Print Name: Yonel DEVICO

TITLE: _Member_

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2008090200329003003E005E

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 21 |
|---|---|

| Document ID: 2008090200329003 | Document Date: 08-18-2008 | Preparation Date: 09-02-2008 |
|---|---|---|
| Document Type: MORTGAGE | | |
| Document Page Count: 20 | | |

| PRESENTER: | RETURN TO: |
|---|---|
| ALPHA ABSTRACT LLC-Q07891 BRS PICK-UP | AMTRUST BANK BRS PICK-UP |
| AS AGENT FOR: UNITED GENERAL TITLE | FINAL DOCS. DEPARTMENT |
| INSURANCE | 1111 CHESTER AVE, STE 200, MAIL CODE OH98-0201 |
| 120 REMINGTON BOULEVARD | CLEVELAND, OH 44114 |
| RONKONKOMA, NY 11779 | |
| 631-471-4888 | |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| QUEENS | 1426 | 20 | Entire Lot | 32-28 97TH STREET |

Property Type: DWELLING ONLY - 1 FAMILY

### CROSS REFERENCE DATA

CRFN_____ *or* Document ID_____ *or* _____ Year_____ Reel _____ Page ____ *or* File Number_____

### PARTIES

| MORTGAGOR/BORROWER: | MORTGAGEE/LENDER: |
|---|---|
| MOHAMMED ALAM | MORTGAGE ELECTRONIC REGISTRATION SYSTEMS |
| 147-11 HOOVER AVENUE | INC. |
| JAMAICA, NY 11435 | P.O. BOX 2026 |
| | FLINT, MI 48501 |

### FEES AND TAXES

| Mortgage | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 177,000.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 177,000.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 885.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 1,991.25 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** | | |
| TASF: | $ | 442.50 | **OF THE CITY REGISTER OF THE** | | |
| MTA: | $ | 501.00 | **CITY OF NEW YORK** | | |
| NYCTA: | $ | 0.00 | Recorded/Filed | 09-04-2008 12:17 | |
| Additional MRT: | $ | 0.00 | City Register File No.(CRFN): | | |
| TOTAL: | $ | 3,819.75 | | **2008000351815** | |
| Recording Fee: | $ | 137.00 | | | |
| Affidavit Fee: | $ | 0.00 | *Annette M Hill* | | |
| | | | ***City Register Official Signature*** | | |

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2008090200329003003E005E

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 21 |
|---|---|---|
| Document ID: 2008090200329003 | Document Date: 08-18-2008 | Preparation Date: 09-02-2008 |

Document Type: MORTGAGE
Document Page Count: 20

| PRESENTER: | RETURN TO: |
|---|---|
| ALPHA ABSTRACT LLC-Q07891 BRS PICK-UP<br>AS AGENT FOR: UNITED GENERAL TITLE<br>INSURANCE<br>120 REMINGTON BOULEVARD<br>RONKONKOMA, NY 11779<br>631-471-4888 | AMTRUST BANK BRS PICK-UP<br>FINAL DOCS. DEPARTMENT<br>1111 CHESTER AVE, STE 200, MAIL CODE OH98-0201<br>CLEVELAND, OH 44114 |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| QUEENS | 1426 | 20 | Entire Lot | 32-28 97TH STREET |

Property Type: DWELLING ONLY - 1 FAMILY

**CROSS REFERENCE DATA**

CRFN _____ *or* Document ID _____ *or* _____ Year _____ Reel _____ Page _____ *or* File Number _____

**PARTIES**

| MORTGAGOR/BORROWER: | MORTGAGEE/LENDER: |
|---|---|
| MOHAMMED ALAM<br>147-11 HOOVER AVENUE<br>JAMAICA, NY 11435 | MORTGAGE ELECTRONIC REGISTRATION SYSTEMS<br>INC.<br>P.O. BOX 2026<br>FLINT, MI 48501 |

**FEES AND TAXES**

| Mortgage | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 177,000.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 177,000.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 885.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 1,991.25 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 442.50 | | |
| MTA: | $ | 501.00 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 3,819.75 | | |
| Recording Fee: | $ | 137.00 | | |
| Affidavit Fee: | $ | 0.00 | | |

After recording please mail to:
AmTrust Bank Final Documents Department
[Name]

[Attention]
1111 Chester Ave, Suite 200, Mail Code: OH98-0201
[Street Address]
Cleveland, Ohio  44114-3516
[City, State  Zip Code]

_____ *[Space Above This Line For Recording Data]*_____

Loan Number:

MIN:

# MORTGAGE

## WORDS USED OFTEN IN THIS DOCUMENT

(A)  "**Security Instrument.**" This document, which is dated **August 18, 2008**, together with all Riders to this document, will be called the "Security Instrument."

(B)  "**Borrower.**" ~~Mohammad~~ *Mohammed* Alam, whose address is **147-11 Hoover Avenue, Jamaica, NY   11435** sometimes will be called "Borrower" and sometimes simply "I" or "me."

(C)  "**MERS**" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI  48501-2026, P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.  **FOR PURPOSES OF RECORDING THIS MORTGAGE, MERS IS THE MORTGAGEE OF RECORD.**

(D)  "**Lender**" is AmTrust Bank.  Lender is a **Federal Savings Bank** organized and existing under the laws of The United States of America.  Lender's address is **1801 East Ninth Street Suite 200, Cleveland, OH  44114.**

(E)  "**Note.**" The note signed by Borrower and dated August 18, 2008, will be called the "Note."  The Note shows that I owe Lender One Hundred Seventy Seven Thousand  and 00/100ths Dollars (U.S. $177,000.00) plus interest and other amounts that may be payable.  I have promised to pay this debt in Periodic Payments and to pay the debt in full by **September 1, 2023.**

(F)  "**Property.**" The property that is described below in the section titled "Description of the Property," will be called the "Property."

(G)  "**Loan.**" The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)  "**Sums Secured.**" The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

(I)    "**Riders.**" All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider        ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider                ☐ Planned Unit Development Rider ☐ Biweekly Payment Rider
☒ 1-4 Family Rider             ☐ Revocable Trust Rider
☐ Other(s) [specify]

(J)    "**Applicable Law.**" All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

(K)    "**Community Association Dues, Fees, and Assessments.**" All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

(L)    "**Electronic Funds Transfer.**" "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)    "**Escrow Items.**" Those items that are described in Section 3 will be called "Escrow Items."

(N)    "**Miscellaneous Proceeds.**" "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

(O)    "**Mortgage Insurance.**" "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)    "**Periodic Payment.**" The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

(Q)    "**RESPA.**" "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to MERS (solely as nominee for Lender and Lender's successors in interest) and its successors in interest subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those

rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

I understand and agree that MERS holds only legal title to the rights granted by me in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:

(A) to exercise any or all of those rights, including, but not limited to, the right to foreclose and sell the Property; and

(B) to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

## DESCRIPTION OF THE PROPERTY

I give MERS (solely as nominee for Lender and Lender's successors in interest) rights in the Property described in (A) through (G) below:

(A) The Property which is located at **3228 97th Street**
[Street]
**East Elmhurst** , New York 11369                                       ("Property Address"):
[City, Town or Village]          [Zip Code]
Queens County. It has the following legal description:

**See Attached Exhibit A**

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

# ALPHA ABSTRACT, LLC

## Title No. ALP-07891

### S C H E D U L E   A

ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the Borough and County of Queens, City and State of New York, known and designated as and by Lot No. 586 in Block No. 16 on a certain map entitled, "Map of 1115 Lots belonging to William Ziegler, situate at Corona, Queens County, surveyed August 1890, by G.A. Roullier, C.E. Flusing, New York" and filed in the Queens County Clerk's Office (now Register's) Office, March 25, 1891 which said lot is more particularly bounded and described as follows:

BEGINNING at a point on the westerly side of Clinton Street (now known as 97th Street) distant 260 feet southerly from the corner formed by the intersection of the westerly side of Clinton Street with the southerly side of Smith Avenue (now known as 32nd Avenue);

RUNNING THENCE Westerly parallel with Smith Street, 100 feet;

RUNNING THENCE Southerly parallel with Clinton Street, 20 feet;

RUNNING THENCE Easterly and part of the distance through a party wall, 100 feet to the westerly side of Clinton Street;

RUNNING THENCE Northerly along the westerly side of Clinton Street, 20 feet to the point or place of BEGINNING.

FOR
CONVEYANCING
ONLY

The policy to be issued under this report will insure the title to such buildings and improvements erected on the premises which by law constitute real property.

TOGETHER with all the right, title and interest of the party of the first part, of, in and to the land lying in the street in front of and adjoining said premises.

(E)  All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F)  All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G)  All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

## BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that:  (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender.  This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have.  I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country.  It also contains other promises and agreements that vary in different parts of the country.  My promises and agreements are stated in "plain language."

## COVENANTS

I promise and I agree with Lender as follows:

1.   **Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note.  I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency.  If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument.  Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due.  If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights.  Lender is not obligated to apply such lesser payments when it accepts such payments.  If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds.  Lender may hold such unapplied funds until I make payments to bring the Loan current.  If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me.  In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure.  No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

2.   **Application of Borrower's Payments and Insurance Proceeds.**   Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.

Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me:  First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows:  First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

3.   **Monthly Payments For Taxes And Insurance.**

(a)   **Borrower's Obligations.**  I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance.  Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1)   The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a lien on the Property.  Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2)   The leasehold payments or ground rents on the Property (if any);

(3)   The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4)   The premium for Mortgage Insurance (if any);

(5)   The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6)   If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise.  I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds."  I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items.  Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time.  Any such waiver must be in writing.  In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require.  My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used

in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

(b) Lender's Obligations. Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

(c) Adjustments to the Escrow Funds. Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 26.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

4.   Borrower's Obligation to Pay Charges, Assessments And Claims. I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (a) I agree, in writing, to pay that obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that person. If Lender determines that any part of the

Property is subject to a superior lien, Lender may give Borrower a notice identifying the superior lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

5.   **Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property.  The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods.  The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender.  What Lender requires under the last sentence can change during the term of the Loan.  I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense.  Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender.  Lender will have the right to hold the policies and renewal certificates.  If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender.  If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose.  During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction.  However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed.  Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds.  I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security

Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

7. **Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

(a) **Maintenance and Protection of the Property.** I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as described in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

(b) **Lender's Inspection of Property.** Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

8. **Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

9. **Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture, proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a lien which may become superior to this Security Instrument, or to enforce laws or regulations); or

(c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender every 14 days an amount equal to one-twenty-sixth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time, and may enter into agreements with other parties that share or change their risk, or reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

©2000, The Compliance Source, Inc.

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has – if any – regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to (a) receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

11.  Agreements About Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date the Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the

default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full. The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12.   Continuation of Borrower's Obligations And of Lender's Rights.**

(a)   **Borrower's Obligations.**   Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

(b)   **Lender's Rights.**   Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13.   Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.**   If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14.   Loan Charges.**   Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without

any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

15. **Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

18. **Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

19. **Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

New York Mortgage—Single Family—Fannie Mae/Freddie Mac Uniform Instrument                                        Form 3033 1/01
MERS Modified
The Compliance Source, Inc.                                    Page 12 of 16    Modified by Compliance Source 14301NY 08/00 Rev. 04/08
www.compliancesource.com                                                                 ©2000, The Compliance Source, Inc.

(d)  I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required.  However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

20.  Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.  The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times.  I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action.  If Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

21.  Continuation of Borrower's Obligations to Maintain and Protect the Property.  The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The promises in this paragraph do not apply to the

---

presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat or release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

## NON-UNIFORM COVENANTS

I also promise and agree with Lender as follows:

22. **Lender's Rights If Borrower Fails to Keep Promises and Agreements.** Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

(1) The promise or agreement that I failed to keep or the default that has occurred;

(2) The action that I must take to correct that default;

(3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;

(4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of foreclosure and sale;

(5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

(6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

23. Lender's Obligation to Discharge this Security Instrument. When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

24. Agreements about New York Lien Law. I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

25. Borrower's Statement Regarding the Property [check box as applicable].

☒ This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

☐ This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

☐ This Security Instrument does not cover real property improved as described above.

The following signature(s) and acknowledgment(s) are incorporated into and made a part of this New York Mortgage dated **August 18, 2008** between **Mohammad Alam**, and **AmTrust Bank**.

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 16 of this Security Instrument and in any rider signed by me and recorded with it.

_Mohammed Alam_ (Seal)
-Borrower
**Mohammed Alam**
[Printed Name]

_____ (Seal)
-Borrower
[Printed Name]

_____ (Seal)
-Borrower
[Printed Name]

_____ (Seal)
-Borrower
[Printed Name]

## ACKNOWLEDGMENT

State of NY                                    §
                                               §
County of Queens                               §

On the 18th day of August                          in the year 2008          , before
me,          , the undersigned, a Notary Public in and for said State, personally appeared **Mohammed Alam** personally
known to me (or proved to me on the basis of satisfactory evidence) to be the individual(s) whose name is(are)
subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity(ies)
and that by his/her signature(s) on the instrument, the individual(s), or the person upon behalf of which the
individual(s) acted, executed the instrument.

_____
Signature of Individual Taking Acknowledgment

VINCENT A. ALAGNA
NOTARY PUBLIC, State of New York
No. 01AL5061283
Qualified in Suffolk County
Commission Expires June 30, 2011

_____
Printed Name

_____
Office of Individual Taking Acknowledgment

(Seal)                    SEAL        My Commission Expires:

# EXHIBIT B

# MORTGAGE LOAN PURCHASE AGREEMENT

This Mortgage Loan Purchase Agreement is dated and effective as of **January 10, 2017** by and between, Blue Lagoon LLC, a DL limited (the "Sellers"), and Courchevel 1850 LLC, a Delaware limited liability company (the "Purchaser").

## RECITALS

Seller desires to sell and Purchaser desires to purchase certain mortgage loans owned by Seller, including, without limitation, all right of Seller to service and administer such mortgage loans and the related residential properties.

NOW, THEREFORE, in consideration of the mutual agreement hereinafter set forth, and for other good and valuable consideration, Seller and Purchaser agree as follows:

## ARTICLE I
## DEFINITIONS

Whenever used herein, the following words and phrases shall mean (and the singular thereof shall include the plural thereof and conversely):

Agreement: This Asset Purchase Agreement, as the same may be amended and supplemented from time to time by written agreement of Seller and Purchaser.

Assignment of Mortgage: With respect to any Loan, an assignment, notice of transfer or equivalent instrument, in recordable form, sufficient under the laws of the jurisdiction where the Mortgaged Property is located, to reflect the sale of the Loan to Purchaser.

Closing Date: **January 10, 2017** or such other date to which the parties may mutually agree in writing.

Cut-off Date: **January 10, 2017** or such other date to which the parties may mutually agree in writing...

Loan: Each individual mortgage loan listed on the Loan Schedule and sold by Seller to Purchaser hereunder, including, but not limited to, all Servicing Rights associated therewith, the Mortgage File, all escrow deposits, all related payments, all amounts received in connection with the liquidation thereof (whether through the sale or assignment of such Loan, trustee's sale or otherwise), all proceeds under any Insurance Policy relating thereto and all awards or settlements (whether permanent or temporary, partial or entire, by exercise of power of eminent domain or condemnation (but only to the extent not required to be released to the Mortgagor under the Loan Documents)).

Loan Documents: With respect to each Loan, the Note, the Mortgage and any other documents or instruments in Seller's possession or control creating or relating to the collateral security or credit support for the Note, including, without limitation, any security agreement, financing statement, assignment of rents, pledge agreement, guaranty, indemnification agreement, title insurance policy, fire and casualty insurance policies, other insurance and other documents, agreements or instruments under which legal rights or obligations are created or exist, if any, provided to Seller or a predecessor in interest.

Loan Schedule: The schedule of Loans attached hereto as **Schedule 1**.

Loan Schedule: The schedule of Loans attached hereto as <u>Schedule 1</u>.

Mortgage: The mortgage, deed of trust or other instrument creating a lien interest in a fee simple or leasehold estate in real property securing a Note.

Mortgage File: As to any Loan, the Loan Documents and all other documentation, correspondence and records in the possession of or available to Seller pertaining to such Loan.

Mortgaged Property: With respect to a Loan, the residential property securing a Note, consisting of a fee simple or leasehold estate in a single parcel of land improved by a residential dwelling.

Mortgagor: The obligor on a Note.

Note: The note or other evidence of the indebtedness of a Mortgagor with respect to a Loan.

Person: An individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Principal Balance: The unpaid principal balance of a Loan as of the close of business on the Cut-off Date, as shown on the books and records of Seller, provided that the Principal Balance shall not include any accrued but unpaid fees or charges.

Purchase Price: ████████

Servicing File: The file maintained by Seller or its designee in connection with the servicing of a Loan.

Servicing Rights: With respect to any Loan, any and all rights to service the Loan, which such rights shall include, but not be limited to: (a) the right to obtain, possess and use any and all documents, files, records, servicing files, servicing documents, servicing records, data tapes, computer records, or other information pertaining to the Loan or pertaining to the past, present or prospective servicing of the Loan; (b) the right to collect all amounts payable with respect to the Loan; and (c) the right to receive and retain all late fees, assumption fees, penalties or similar payments with respect to the Loan;

Servicing Transfer Date: Simultaneous with closing.

## ARTICLE II
## PURCHASE AND SALE

2.1 Purchase and Sale of Loans. Subject to the terms and provisions set forth in this Agreement, on the Closing Date, (a) Seller shall sell, assign and convey to Purchaser and Purchaser shall buy and accept from Seller all of Seller's right, title and interest in each Loan listed in the Loan Schedule, the associated Servicing Rights, the Mortgage File and the Servicing File and (b) Purchaser shall pay to Seller, in immediately available funds, the Purchase Price for each such Loan. Notwithstanding the foregoing, Seller shall continue servicing each Loan that is sold on the Closing Date until the Service Transfer Date, unless otherwise agreed to in writing by the parties, in conformance with those mortgage servicing practices (as applicable) of prudent mortgage lending institutions that service mortgage loans of the same type as such Loan in the jurisdiction where the related Mortgaged Property (as applicable) is

Page 2 of 7

located. Purchaser shall assume responsibility for servicing each Loan on and after such Service Transfer Date.

2.2 <u>Pre-Closing Actions</u>. From the Cut-Off Date to and including the Closing Date, Seller shall not, without the prior written consent of Purchaser: (a) release any collateral or any party from any liability on or with respect to any of the Loan Documents, (b) compromise or settle any claims of any kind or character with respect to any of the Loans or (c) with respect to any Loan, initiate, complete or otherwise take any action with respect to a foreclosure on the related Mortgaged Property except to the extent required pursuant to action taken prior to the date hereof.

2.3 <u>"AS - IS" Sale</u>. THE LOAN IS SOLD, TRANSFERRED, ASSIGNED AND CONVEYED TO PURCHASER ON AN "AS IS, WHERE IS" BASIS, WITH ALL FAULTS. Seller makes no representations, warranties or covenants with respect to the Loans of any kind. Purchaser acknowledges that it is a sophisticated investor and real estate investor and its decision to purchase the Loans is based upon its own independent expert evaluation of the Loans and the Mortgaged Properties and other materials deemed relevant by Purchaser. In entering into this Agreement, Purchaser has not relied upon any oral or written information from the Seller, or any of its respective employees, affiliates, agents or representatives. Purchaser further acknowledges that no employee, agent or representative of the Seller has been authorized to make, and that Purchaser has not relied upon, any statements or representations with respect to the Loans. Without limiting the foregoing, Purchaser acknowledges that Seller has not made any representations or warranties as to the Loans (including, without limitation or limiting the generality of the foregoing, any representation or warranty relating to the value, marketability, condition or future performance thereof, the existence of leases or the status of any tenancies or occupancies with respect thereto, and the applicability of any rent control or rent stabilization laws on the compliance or lack of compliance thereof with any laws (including without limitation, environmental, land use or occupancy laws)), the enforceability of the Loans, the validity of the loan documents comprising the loan files used in the underwriting process, the accuracy of representations made by the borrower or its agents or any other party involved in the loan origination process (including agents and employees of the related originator), known or unknown defects affecting the Mortgaged Properties or structures thereon, the status of title to the Mortgaged Properties including but not limited to outstanding, delinquent and/or sold tax liens, governmental liens for nonpayment of an obligation, judgment liens, superior liens and easements and other encumbrances and/or use restrictions that may limit or negate the intended or effective use of the Mortgaged Properties, the past, present or future value of the Loans or the related Mortgaged Properties, or the insurability of the Mortgaged Properties. Seller has also informed Purchaser that the certain or all of Loans have been, may be, and/or may subsequently become delinquent, subject to foreclosure, demolition, nuisance abatement or code enforcement proceedings, subject to challenges regarding their enforceability brought by or on behalf of the borrowers or unrelated third parties, and/or subject to borrower-related bankruptcy proceedings. Purchaser is aware that there may be delinquent taxes, ground rents, water charges, sewer rents, assessments, insurance premiums, leasehold payments, or other outstanding charges, including charges or assessments payable in future installments affecting the related Mortgaged Properties. Purchaser acknowledges that it has had the opportunity to conduct legal and other appropriate due diligence as to the Loans. Purchaser is aware of the level of and form of documentation with respect to the Loans and takes the Loans with the knowledge that such documentation may be incomplete. Purchaser acknowledges that the Loans may have limited or no liquidity. Purchaser acknowledges and agrees that Seller does not represent, warrant or covenant the nature, accuracy, completeness, enforceability or validity of the Loans or any related documentation or information, if any, made available to Purchaser in connection with the Loans and, all documentation or information, if any, which is or has been made available to Purchaser has been made available to Purchaser on an "AS IS, WHERE IS" BASIS, WITH ALL FAULTS.

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLER

3.1 Representations and Warranties. Seller represents and warrants to Purchaser that as of the Closing Date:

(a) Due Organization, Etc. Seller has been duly organized under the laws of the jurisdiction of its organization and is validly existing and in good standing under the laws of all jurisdictions in which failure to do so could affect the enforceability of any Loan, the value of any Loan or the ability of Seller to perform its obligations under this Agreement.

(b) Authority. Seller has the full power, authority and legal right to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform and observe all terms and conditions contained herein.

(c) No Conflict or Violation. The execution and delivery of this Agreement by Seller does not, and the performance of this Agreement by Seller will not, (i) result in a violation of or conflict with any provisions of the governing instruments of Seller, (ii) violate any law, rule, regulation, code, ordinance, judgment, injunction, order, writ, decree, or ruling applicable to Seller, or (iii) conflict with or violate any agreement, permit, concession, grant, franchise, license, or other governmental authorization or approval necessary for sale of any Loan by Seller.

(d) Enforceability. This Agreement has been duly and validly authorized, executed and delivered by Seller and (assuming the due authorization, execution and delivery hereof by Purchaser) constitutes a valid, legal and binding agreement of Seller enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF PURCHASER

4.1 Representations and Warranties. Purchaser represents and warrants to Seller that as of the Closing Date:

(a) Due Organization, Etc. Purchaser has been duly organized under the laws of the jurisdiction of its organization, is validly existing and in good standing under the laws of all jurisdictions in which failure to do so could affect the enforceability of this Agreement or its ability to perform its obligations under this Agreement.

(b) Authority. Purchaser has the full power, authority and legal right to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform and observe all terms and conditions contained herein.

(c) No Conflict or Violation. The execution and delivery of this Agreement by Purchaser does not, and the performance of this Agreement by Purchaser will not, (i) result in a violation of or conflict with any provisions of Purchaser's governing instruments, (ii) violate any law, rule, regulation, code, ordinance, judgment, injunction, order, writ, decree, or ruling applicable to Purchaser, or (iii) conflict with or violate any agreement, permit, concession, grant, franchise, license, or other governmental authorization or approval applicable to Purchaser with respect to this Agreement or the transaction contemplated by this Agreement.

Page 4 of 7

(d) Enforceability. This Agreement has been duly and validly authorized, executed and delivered by it and (assuming the due authorization, execution and delivery hereof by Seller) constitutes the valid, legal and binding agreement of Purchaser enforceable in accordance with this its terms, subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

<div align="center">

### ARTICLE V
### MISCELLANEOUS

</div>

5.1 Survival. All representations, warranties, covenants and agreements of Seller and Purchaser hereunder and in any certificate or other instrument delivered pursuant hereto shall survive the consummation of the purchase and sale transactions contemplated hereby, the delivery of the Loans to Purchaser and the payment of each Loan for a period ending ninety (90) calendar days following the Closing Date.

5.2 Successors and Assigns. Neither party shall assign any of its rights, duties or obligations under this Agreement without the prior written consent of the other Party. This Agreement shall bind and inure to the benefit of and be enforceable by Seller and Purchaser, their respective successors and any assignee permitted under this Section. Any attempted assignment in violation of this Section shall be void *ab initio*.

5.3 Notices. Any notices or other communications permitted or required hereunder shall be in writing and shall be deemed conclusively to have been duly given when delivered if personally delivered, sent by overnight courier, or mailed by registered mail, postage prepaid and return receipt.

5.4 Counterparts. This Agreement may be executed in several counterparts each of which shall constitute an original, but all of which together shall constitute one instrument notwithstanding that all parties are not signatories to the same counterparts.

5.5 Schedules; Entire Agreement. The Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. This Agreement constitutes the entire agreement and understanding of the parties with respect to the matters and transactions contemplated by this Agreement and supersedes any prior agreements and understandings, whether written or oral, with respect to those matters and transactions.

5.6 Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, and the parties agree that any disputes or litigation shall be determined by the courts of the State of New York

5.7 Waiver of Jury Trial. EACH OF THE PARTIES HERETO WAIVES ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST THE OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. EACH OF THE PARTIES HERETO AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING,

THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION 5.7 AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF OR THEREOF.     THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

5.8 Attorneys' Fees. If either party brings any suit or other proceeding regarding the subject matter or enforcement of this Agreement, the prevailing party (as determined by the court, agency or other authority before which such suit or proceeding is commenced), in addition to such other relief as may be awarded, shall be entitled to recover reasonable attorneys' fees, expenses and costs of investigation actually incurred.

5.9 Amendments; Waivers. Failure or delay on the part of Purchaser to exercise any right provided for herein shall not act as a waiver thereof, nor shall any single or partial exercise of any right by Purchaser or Seller preclude any other or further exercise thereof. In no event shall a term or provision of this Agreement be deemed to have been waived, modified or amended, unless said waiver, modification or amendment is in writing and signed by the parties hereto.

5.10 No Agency, Partnership or Joint Venture. Under no circumstances shall Purchaser and Seller be considered agents or employees of each other, nor shall this Agreement be construed as creating a partnership or joint venture.

IN WITNESS WHEREOF, Purchaser and Seller have caused their respective duly authorized representatives to execute this Agreement as of the date first above written.

Sellers

**Blue Lagoon LLC**

By: _____

Name: Yonel Devico

Title Member

**Courchevel 1850 LLC**
as Seller

By: _jared dotoli_____

Name:  Jared Dotoli
Title:  Officer
        Member

Schedule 1
**Description of Mortgage**

125212

ALAM   3228 97TH STREET

EAST ELMHURST NY
11369